No. 15-1412

In the United States Court of Appeals
for the Federal Circuit

Specialized Bicycle Components, Inc.,

*Appellant*,

v

K.G. Motors, Inc.,

*Appellee*.

Appeal from the United States Patent and Trademark Office in
Appeal 2014-002865, Reexamination Control No. 95/001,125,
Patent Trial and Appeal Board

## BRIEF OF APPELLANT

Jonathan H. Margolies
Katherine W. Schill
Kevin P. Moran
MICHAEL BEST & FRIEDRICH LLP
100 E. Wisconsin Ave.
Milwaukee, WI 53202
Telephone: 414-271-6560
Facsimile: 414-271-0656
*Attorneys for Specialized Bicycle
Components, Inc.*

**Form 9**

FORM 9.   Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Specialized Bicycle Components, Inc. v. K.G. Motors, Inc.

No. 2015-1412

## CERTIFICATE OF INTEREST

Counsel for the (~~petitioner~~) (appellant) (~~respondent~~) (~~appellee~~) (~~amicus~~) (name of party)

Specialized Bicycle Components, Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Specialized Bicycle Components, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Michael Best & Friedrich LLP by Katherine W. Schill, Jonathan H. Margolies, and Kevin P. Moran

03-18-2015
Date

/s/ Katherine W. Schill
Signature of counsel

Katherine W. Schill
Printed name of counsel

Please Note: All questions must be answered
cc: Counsel of Record

124

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ................................................................1

JURISDICTIONAL STATEMENT ..............................................................1

STATEMENT OF THE ISSUES.................................................................2

STATEMENT OF THE CASE.....................................................................2

STATEMENT OF FACTS ...........................................................................4

I.      Summary of the Claimed Subject Matter ........................................4

      A.     "trough" .................................................................................6

      B.     "bead seat".............................................................................7

      C.     "sidewall height" ..................................................................8

II.     The Prior Art.................................................................................9

III.    Proffered Evidence of Secondary Considerations.........................12

SUMMARY OF THE ARGUMENT ........................................................16

ARGUMENT ..........................................................................................16

I.      Standards Of Review ...................................................................16

II.     The Prior Art Creates a Strong *Prima Facie* Case of
      Obviousness.................................................................................17

III.    Substantial Evidence Does Not Support the Board's
      Finding of Commercial Success. ..................................................19

      A.     Evidence of Gross Sales, Without More, Cannot Establish
           Commercial Success.............................................................19

      B.     The Evidence of Purported Commercial Success Lacked a
           Nexus to the Claimed Invention...........................................21

           1.    The Evidence Presented by K.G. Motors Utterly Fails to
                 Establish the Nexus Required by this Court. ............................22

           2.    The Board Explicitly and Erroneously Relies on a Prior
                 Art Feature to Establish the Required Nexus...........................25

           3.    The Media Citations Do Not Support a Finding of a
                 Nexus Because They Prove That Any Commercial
                 Success Arose From Non-Patented Features ............................26

4.    K.G. Motors' Increased Marketing Campaign Obscures
       any Nexus Between the Patented Features and the Rims'
       Purported Commercial Success ................................................28

IV.   The Board Erred by Concluding that Evidence of
       Commercial Success Outweighed the Strong *Prima
       Facie* Case of Obviousness..........................................................29

CONCLUSION ....................................................................................31

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Gardner v. TEC Systems, Inc.*,
  725 F.2d 1338 (Fed. Cir. 1984) ........................................................18

*In re Applied Materials, Inc.*,
  692 F.3d 1289 (Fed. Cir. 2012) .......................................................17

*In re Baxter*,
  678 F.3d 1357 (Fed. Cir. 2012) .......................................................17

*In re DBC*,
  545 F.3d 1373 (Fed. Cir. 2008) .................................................21, 22

*In re Dillon*,
  919 F.2d 688 (Fed. Cir. 1990) .........................................................19

*In re Enhanced Sec. Research, LLC*,
  739 F.3d 1347 (Fed. Cir. 2014) .......................................................16

*In re Galderma Labs.*,
  737 F.3d 731 (Fed. Cir. 2013) .........................................................21

*In re Huang*,
  100 F.3d 135 (Fed. Cir. 1996) ....................................20, 21, 22, 25

*In re Kao*,
  639 F.3d 1057 (Fed. Cir. 2011) .................................................19, 23

*In re Teles AG Informationstechnologien*,
  747 F.3d 1357 (Fed. Cir. 2014) .......................................................16

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)...........................................................17, 29, 30

*McNeil PPC, Inc. v. L. Perrigo Co.*,
  337 F.3d 1362 (Fed. Cir. 2003) .......................................................28

*Media Techs. Licensing LLC v. Upper Deck Co.*,
  596 F.3d 1334 (Fed. Cir. 2010) .................................................24, 29

*Ormco Corp. v. Align Tech., Inc.*,
  463 F.3d 1299 (Fed. Cir. 2006) ...................................................21, 25

*Q.I. Press Controls, B.V. v. Lee,*
  752 F.3d 1371 (Fed. Cir. 2014) ..........................................................17

*Titanium Metal Corp. of America v. Banner*,
  778 F.2d 775 (Fed. Cir. 1985) ............................................................18

*Tokai v. Easton*,
  632 F.3d 1358 (Fed. Cir. 2011) ..........................................................30

*Western Union Co. v. MoneyGram Payment Sys.*,
  626 F.3d 1361 (Fed. Cir 2010) ...................................................25, 29

**STATUTES**

28 U.S.C. § 1295(a)(4)(A) ......................................................................1

35 U.S.C. § 6 .............................................................................................1

35 U.S.C. §§ 102 and 103 ........................................................................2

35 U.S.C. §141 .........................................................................................1

**OTHER AUTHORITIES**

37 C.F.R. § 41.77 ......................................................................................1

37 C.F.R. § 41.77(b) .................................................................................3

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Specialized Bicycle Components, Inc. ("Specialized") identifies the following case that will directly affect or be directly affected by this Court's decision in the present appeal: *K.G. Motors v. Specialized Bicycle Components, Inc.*, Case No. 08-CV-6422-MAT, for infringement of U.S. Patent No. 7,334,846 ("the '846 patent"), currently pending in the United States District Court for the Western District of New York.

## JURISDICTIONAL STATEMENT

This case started as an *inter partes* reexamination of the '846 patent, Control No. 95/001,125 ("Reexam"). On February 28, 2012, the Board of Patent Appeals and Interferences ("Board") issued a Decision on Appeal ("2012 Decision") in the Reexam, and on May 29, 2012, K.G. Motors, Inc. ("K.G. Motors") reopened prosecution under 37 C.F.R. § 41.77. On November 26, 2014, the Board[1] issued a second Decision on Appeal ("2014 Decision"). Specialized timely appealed from the 2014 Decision to this Court. This Court has jurisdiction over the appeal under 35 U.S.C. §141 (pre-September 16, 2012) and 28 U.S.C. § 1295(a)(4)(A).

---

[1] On September 16, 2012, during the pendency of the *inter partes* reexamination proceeding under review in this appeal, the Board of Patent Appeals and Interferences became the Patent Trial and Appeal Board. *See* 35 U.S.C. § 6. For purposes of simplicity, this brief will refer to both institutions (pre- and post-AIA) as the "Board."

1

## STATEMENT OF THE ISSUES

Did the Board err by finding that K.G. Motors' evidence of gross sales established the secondary consideration of commercial success, despite the absence of evidence regarding market share and despite the lack of a nexus between the gross sales and the claimed features of the '846 patent?

Did the Board err by finding that evidence of commercial success was sufficient to overcome the strong *prima facie* finding of obviousness?

## STATEMENT OF THE CASE

This case stems from a request for *inter partes* reexamination of the '846 patent filed on November 26, 2008.  A0034; A0585-A0682.  Shortly thereafter, on January 5, 2009, the examiner granted that request and issued an office action rejecting all 29 claims of the '846 patent under 35 U.S.C. §§ 102 and 103.  A0034; A0683-A0702; A0685; A0694-A0701.  In so doing, the examiner relied on prior art references including U.S. Patent 7,090,307 ("Okajima '307"); U.S. Patent 6,568,766 ("Okajima '766"); U.S. Patent 6,402,255 ("Chen"); and U.S. Patent 7,104,300 ("Veux"). A0695.

On September 14, 2010, the examiner reversed course and issued a Right of Appeal Notice confirming the patentability of all claims of the '846 patent. A0034; A0703-A0716.  Specialized filed a timely Notice of Appeal on October 12,

2

2010, requesting review before the Board. A0034; A0717-A0722. The Board received briefing from the parties and conducted an oral hearing on November 16, 2011, in which Administrative Patent Judge Song noted that some of the allegedly novel features of the claims were "engineering 101" and "as old as the hills." A0724; A0741-A0742.

The Board reversed the examiner on February 28, 2012. In the 2012 Decision, the Board entered six new grounds of rejection based primarily on Okajima '307 in view of Okajima '766. A0058-A0085. In response to the Board's new grounds of rejection, K.G. Motors filed a May 29, 2012, request to reopen prosecution pursuant to 37 C.F.R. § 41.77(b). A0035; A0757-A0778. With that request, K.G. Motors also submitted a new declaration signed by inventor Stanley Koziatek under 37 C.F.R. § 1.132 (the "Koziatek Declaration") intended to provide evidence of secondary considerations in the form of commercial success and unexpected results. A0778; A0144-A0207.

On November 19, 2013, the examiner maintained the Board's finding of obviousness and concluded that the Koziatek Declaration did not support a finding of commercial success or unexpected results sufficient to overcome the strong *prima facie* finding of obviousness. A0779-A0797 at A0786. That decision led to another appeal before the Board.

On November 26, 2014, the Board issued the 2014 Decision and once again reversed the examiner, once again confirming the *prima facie* finding of obviousness but this time holding that the evidence of record demonstrated commercial success sufficient to render the claims non-obvious.  A0001-A0021 at A0018-A0019.  In particular, the Board agreed "that it would have been obvious to one of ordinary skill in the art, starting with Okajima '307, to have turned to the sidewall height of Okajima '766 in the rim of Okajima '307."  A0011-A0012.  The Board also rejected the evidence of alleged unexpected results provided in the Koziatek Declaration.  A0013.  Nevertheless, the Board concluded that evidence of alleged commercial success in the Koziatek Declaration was "of sufficient weight to render the claims non-obvious."  A0019.

This appeal followed.

## STATEMENT OF FACTS

### I.    Summary of the Claimed Subject Matter

The '846 patent generally relates to a bicycle wheel rim.    The two independent claims of the '846 patent are claims 1 and 23, printed below:

> 1. A bicycle wheel rim onto which a tubeless tire can be mounted, comprising:
> a base portion having a proximal surface engageable with a spoke member and an opposing distal surface engageable with a surface of a tire bead of the tubeless tire, wherein the distal surface has a trough, and, in cross sectional profile, a flat bead seat immediately adjacent and contiguous with the trough to an intersection point

with a respective sidewall surface such that the tire bead rests on the flat bead seat when mounted; and

an integral sidewall extending from an intersection of the proximal surface and the distal surface, wherein a most distal point of the sidewall extends no further than 0.200 inches above the flat bead seat of the distal surface of the rim, wherein the bead seat is horizontally disposed with respect to an axial direction of the rim so that when the tire is mounted, the tire bead is pressed between the flat bead seat and the sidewall to provide a ball and socket fit.

A0029 at Col. 5:53-6:5.

23. A bicycle wheel rim onto which a tubeless tire can be mounted, comprising:

a base portion having a proximal surface engageable with a spoke member and an opposing distal surface engageable with a tire bead of the tubeless tire, wherein the distal surface has a trough, and, in cross sectional profile, a flat bead seat; and

an integral sidewall extending from an intersection of the proximal surface and the distal surface, wherein a distal most point of the sidewall extends between 0.150 inches to 0.175 above the flat bead seat of the distal surface of the rim.

A0030 at Col. 7:1-12.

As illustrated in Figures 2 and 4 of the '846 patent, independent claim 1 recites a bicycle wheel rim for a tubeless tire, including these relevant elements:

a trough (517),

a flat and horizontal bead seat (520), and

a sidewall (530) with a height (H) no further than 0.200 inches above the bead seat. A0023-A0024; A0029 at Col. 5:53-67.



Similarly, independent claim 23 of the '846 patent discloses a bicycle wheel rim for a tubeless tire, including, *inter alia:*

a trough (517),

a flat bead seat (520), and

a sidewall (530) with a height (H) between 0.150 - 0.175 inches above the bead seat.  A0030 at Col. 7:1-12.

Specialized provides the following explanation of these claim terms, though their construction was not disputed, in order to provide some useful context for the Court's consideration of the issues in this case:

## A.    "trough"

Independent claims 1 and 23 both recite a "distal surface engageable with a surface of a tire bead . . . wherein the distal surface has a trough."  A0029 at Col. 5:55-58.  The "trough" is labeled with reference numeral 517 in Fig. 2 from the '846 patent, below.  Each trough forms a channel in which a tire bead will sit when the tire is initially mounted to the rim.  A0029 at Col. 5:11-14.  In combination

with the hump (515), the troughs "make it easier to . . . inflate the tire . . . ." A0029 at Col. 5:15-20.



FIG.2

### B.     "bead seat"

The bead seat of the '846 patent is "a flat shelf . . . immediately adjacent and contiguous with the trough." A0028 at Col. 4:6-9. As recited in claim 1, "the tire bead rests on the flat bead seat [520 in Figure 2 above] when mounted." A0029 at Col. 5:60-62. Claim 1 further recites that the flat bead seat is "horizontally disposed with respect to the axial direction of the rim." A0029 at Col. 6:1-2. Thus claim 1 recites a bead seat that is both flat and horizontal. Claim 23 recites a bead seat that is flat but need not be horizontal with respect to the axial direction of the rim.

## C.    "sidewall height"

The wheel rim disclosed in the '846 patent includes an integral sidewall (element 530 in Figure 4 below).  According to the specification, "the sidewall has a height, H, defined as the distance between the surface of the shelf [bead seat] 520 and a distal point 536 of the sidewall 530 that is less than or equal to .200 inches." A0028 at Col. 4:12-16.



FIG.4

Claim 1 requires that "a most distal point of the sidewall extends no further than 0.200 inches above the flat bead seat of the distal surface of the rim."  A0029 at Col. 5:64-67.  The parties and the Board have consistently used the term "sidewall height" as shorthand for the recited distance between the "most distal point of the sidewall" and "the flat bead seat."  Claim 23 recites the same limitation as claim 1, with a dimension range of 0.150 to 0.175 inches.[2]  A0030 at Col. 7:8-12.

---

[2] Specialized notes that if the figures in Okajima '307 were drawn to scale, the dimensions would be in the exact range of the '846 patent.  A0672.

## II.    The Prior Art

As found by the Board in both the 2012 Decision and the 2014 Decision, the prior art of record discloses each element of the claims of the '846 patent.

U.S. Patent No. 7,090,307 ("Okajima '307") discloses a bicycle wheel rim including a sidewall, a trough 32 and a flat, horizontally disposed bead seat adjacent to the trough.  Okajima '307 does not, however, explicitly disclose the particular numerical dimensions of the sidewall height.



Fig. 8

The sidewall dimension not expressly defined in Okajima '307 is explicitly disclosed in U.S. Patent. No. 6,568,766 ("Okajima '766"):



Fig.6

Fig.5

As shown by Figs. 5 and 6 above, Okajima '766 discloses a bicycle wheel rim having a trough 62d and a flat (though not horizontal) bead seat 62b. The patent also discloses a sidewall height (defined as the distance D2 between lines L1 and L2) of 4.5 to 6.5 millimeters. A0359 at Col. 7:29-32. It is undisputed that this measurement equals 0.177 inches to 0.256 inches. A0074. ("Okajima '766 describes a distance D2, which corresponds to a sidewall height of between about 4.5 millimeters and about 6.5 millimeters (0.177 inches to 0.256 inches) and significantly overlaps the claimed range."). Okajima '766 thus discloses a range for the sidewall height that specifically includes the height recited in claims 1, 2, and 4-22 of the '846 patent, *i.e.,* no more than 0.200 inches. With respect to claims 3 and 23-29 of the '846 patent, the sidewall height range disclosed by Okajima '766 is within 0.002 inches of the recited upper height limit, *i.e.,* 0.175 inches. A0075.

Dependent claims 4, 5, 10, 11, 13-18 and 27-28 of the '846 patent recite a hump contiguous with the trough. The hump "contributes to the strength and stiffness of the rim." A0028 at Col. 4:65-A0029 at Col. 5:2. The prior art, including U.S. Patent 6,402,255 ("Chen") discloses a wheel rim with a hump. In particular, Chen discloses a bicycle wheel rim 3 that includes a base wall 31 having a central trough 312 and a contiguous hump or vaulted portion 33 in the center of the trough. Chen points out that one purpose of the hump 33 is to raise the inner tube 41 to facilitate installation of the tire 42. A0304 at Col. 3:18-22. The hump 33 also facilitates securing a circular disc 6 to the rim. *Id.* at Col. 3:30-33.



FIG. 4    FIG. 5

Finally, U.S. Patent 7,104,300 ("Veux") discloses a bicycle rim 1 including a trough or well 15 near a central portion of the rim 1, and lateral edges or flat and horizontal bead seats 16, 17. A sealing strip 25 (Fig. 3, below) can be used with

the rim 1, and includes a median depression 26 bordered by lateral extensions 28, 29. In one embodiment (Fig. 7, below), the sealing strip 71 includes a central rib (or hump) 70 that projects radially from the base of the trough 15. One purpose of the central rib 70 is to stiffen the structure of the sealing strip 71. A0582 at Col. 6:53-54.



### III.    Proffered Evidence of Secondary Considerations

Inventor Stanley Koziatek's Declaration under Rule 132 stated that his company, K.G. Motors, doing business as NoTubes, started in approximately 2002. A0144 at ¶ 2-3. Mr. Koziatek's declaration provided sales information that states that "a first generation rim" was introduced in 2003, and the rim alleged to be

covered by the patent was introduced in 2004. Mr. Koziatek submitted the following chart regarding sales:

| YEAR | UNITS SOLD OF FIRST GENERATION RIMS | UNITS SOLD OF PATENTED RIMS | DOLLAR AMOUNT | PROFITS FROM PATENTED RIMS |
|---|---|---|---|---|
| 2003 | 151 | | $7,550.00 | |
| 2004 | 1648 | 362 | $104,576.92 | $10,448.00 |
| 2005 | 625 | 7799 | $462,172.50 | $259,402.50 |
| 2006 | | 12233 | $554,793.60 | $294,780.60 |
| 2007 | | 19955 | $848,523.70 | $429,468.70 |
| 2008 | | 27348 | $1,159,749.58 | $585,441.58 |
| 2009 | | 54973 | $1,937,262.90 | $782,829.90 |
| 2010 | | 105730 | $3,094,992.23 | $874,662.23 |
| 2011 | | 129903 | $3,636,384.34 | $908,421.34 |

A0145 at ¶ 6.

Mr. Koziatek stated that this sales data "establishes the nexus between the claimed invention and NoTubes commercial success." *Id.* However, the record contains no evidence of what features were in the "first generation rims," what customer feedback the company received regarding these rims, or what improvements or features unrelated to the claimed invention were added to what Mr. Koziatek designates as the "patented rims." Mr. Koziatek's declaration likewise contains no evidence of the size and scope of the market for these rims,

whether that market grew as a whole from 2003-2011, or what share of the market his company's sales represent.

In addition, NoTubes placed only one advertisement in each of 2004 and 2005. A0148 at ¶ 14. From 2006-2012, NoTubes' advertising grew from 2 to 10 advertisements per year. Each ad ran, on average, for half a year. *Id.*

Mr. Koziatek also referred to an article from *Dirt Rag* magazine which he contends demonstrates public appreciation of the claimed lower sidewall height. A0148-A0149 at ¶ 17; A0181-A0182. The article does not suggest that sidewall height, on its own or in combination with a horizontally disposed flat bead seat and "ball and socket" fit, contributed to the sales of the rims. A0181-A0182. Indeed, the article merely states that the tires "mounted effortlessly due to the deep center channel of the rim, and the 28mm width provided a nice footprint for my 2.25" tires." *Id.* The article never ties the 'effortless' mountability to the sidewall height, and instead merely references a low sidewall height as a "fringe benefit." *Id.*

In addition, other articles referenced by Mr. Koziatek provide no indication of what aspects of the rims are responsible for increased sales. A0183-A0184. (*Bike* magazine article stating "Stan's wheels are made to order with a variety of hub and spoke options" and "[t]hey have a welded seam and a shallow triangular profile with three internal channels for strength."); A0187-A0189 (*Cycling News* article emphasizing the light weight of No Tubes' rims); and A0196-A0197

14

(*Mountain Bike Action* article stating that "the wide bead shelves are what hold the tire on the rim").  The articles submitted also commented on the weight, (A0181-A0184; A0190-A0197) durability (A0181-A0182; A0196-A0197) and price (A0183-A0184) of the NoTubes rim.  Moreover, much of the literature focuses on the tubeless aspect of these rims, highlighted by the brand name, and the sealant introduced by inventor Koziatek. A0190-A0191.  Another article states that Mr. Koziatek "almost single-handedly created … the tubeless tire sealant category." A0200-A0201.  Sealants are not an aspect of any claim on the '846 patent.

Specialized introduced a rim in 2009 called the Roval Control Rim. ("Control Rim").  The 2009 model was accused of infringing the '846 patent. Beginning in 2010, Specialized sold a redesigned Control Rim with a sidewall height of .209 inches (5.3 mm) and a flat bead seat oriented approximately 3 degrees from horizontal.  A0245-A0247 at A0246 ¶ 4.  The sidewall height specification is clearly outside the claims of the '846 patent.  No other changes were made to the Control Rim.  *Id.*

Specialized sold 1,536 accused Control rims in 2009.[3]  After the design modification, Specialized sold 2,276 units in 2010; 3,376 units in 2011; and 6,177 units in 2012 – all without an increase in marketing exposure or change in rim performance.  *Id.* at ¶¶ 5-6.

---

[3] Specialized is a bicycle manufacturer. Unlike Mr. Koziatek's company, Specialized's primary business is not selling rims.

## SUMMARY OF THE ARGUMENT

In this proceeding, the Board has *twice* found that every claim of the '846 patent would have been *prima facie* obvious over the prior art of record.  The Board has also rejected K.G. Motors' evidence of alleged unexpected results.  The Board's about-face in upholding the claims in the 2014 Decision thus rests entirely on its assessment of alleged commercial success—specifically, (1) its finding that the gross sales data and articles presented in the Koziatek Declaration demonstrated commercial success, and (2) its conclusion that such evidence outweighs the clear evidence of obviousness over the cited prior art.  That decision cannot stand.  The evidence in the Koziatek Declaration cannot establish commercial success because gross sales alone provide no context to determine success in the market and because that evidence lacks any nexus with the claims of the '846 patent.  Furthermore, even if the Koziatek Declaration could show legally relevant commercial success, such weak evidence does not outweigh the substantial, clear-cut showing of obviousness in view of the prior art.

## ARGUMENT

### I.    Standards Of Review

This Court reviews Board "decisions *de novo* for errors of law and for substantial evidence as to questions of fact."  *In re Teles AG Informationstechnologien*, 747 F.3d 1357, 1361 (Fed. Cir. 2014) (citing *In re*

*Enhanced Sec. Research, LLC*, 739 F.3d 1347, 1351 (Fed. Cir. 2014)). Obviousness is a question of law with underlying factual inquiries, such as what a reference teaches and whether secondary considerations are present. *In re Applied Materials, Inc.,* 692 F.3d 1289, 1294 (Fed. Cir. 2012). This Court reviews the ultimate conclusion regarding obviousness *de novo,* and the Board's underlying factual findings for substantial evidence. *Id.* Significantly, the standard here to prove obviousness—"a preponderance of the evidence—is substantially lower than in a civil case and there is no presumption of validity in reexamination proceedings." *Q.I. Press Controls, B.V. v. Lee,* 752 F.3d 1371, 1377 (Fed. Cir. 2014) (quoting *In re Baxter Int'l, Inc.,* 678 F.3d 1357, 1364 (Fed. Cir. 2012)).

## II. The Prior Art Creates a Strong *Prima Facie* Case of Obviousness.

The Board twice found that a person of ordinary skill in the art would have been motivated to provide rims having the claimed configurations, including sidewall heights within the recited ranges. A0074; A0008.

The United States Supreme Court has mandated "the need for caution in granting a patent based on the combination of elements found in the prior art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). Further, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* Where the only difference between the prior art and the claims is a recitation of relative dimensions

of the claimed device, and a device having the claimed relative dimensions would not perform differently than the prior art device, the claimed device is not patentably distinct from the prior art device. *Gardner v. TEC Systems, Inc.*, 725 F.2d 1338, 1348 (Fed. Cir. 1984).

As noted above, Okajima '307 discloses a bicycle wheel rim for tubeless tires that contains all the elements of the '846 patent claims except the specific sidewall heights recited in claims 1 and 23. That gap, however, is readily filled by Okajima '766, which discloses "a bicycle [wheel] rim having a sidewall height of . . . 0.177 inches and 0.256 inches." A0067; A0359 at Col. 7:29-32. One of ordinary skill in the art would have found it obvious to provide the rim of the Okajima '307 patent with the sidewall height dimensions expressly disclosed by the same inventor in his Okajima '766 patent. A0074.

Accordingly, claim 1 of the '846 is *prima facie* obvious. A0074-A0075. Moreover, claim 23 is also *prima facie* obvious because "the upper limit of the sidewall height recited in claim 23, and the lower limit of the sidewall disclosed in Okajima '766," which differ by a mere 0.002 inches, "are sufficiently close to establish a *prima facie* case of obviousness." A0075-A0076 (citing *Titanium Metal Corp. of America v. Banner*, 778 F.2d 775, 783 (Fed. Cir. 1985)).

Further, the Board determined that adding a hump in the rim as disclosed in Chen or the rib or hump as disclosed in Veux to the combination of Okajima '307

and Okajima '766 would have been obvious.  A0076-A0077.  K.G. Motors cannot

reasonably dispute that conclusion.[4]

## III.  Substantial Evidence Does Not Support the Board's Finding of Commercial Success.

Despite the overwhelmingly strong case of obviousness against the '846

patent, the Board relied on a single declaration from the patent's inventor to find

that the secondary consideration of commercial success rendered the claims non-

obvious.  The Board erred when it determined that the Koziatek Declaration

establishes commercial success, and when it determined that the Koziatek

Declaration established a nexus between the purported commercial success and the

claimed invention.  Neither finding is supported by substantial evidence.

### A.  Evidence of Gross Sales, Without More, Cannot Establish Commercial Success.

Once a *prima facie* case of obviousness is established, the patent owner

bears the burden of proving secondary considerations like commercial success.

*See, e.g., In re Dillon,* 919 F.2d 688, 692 (Fed. Cir. 1990).  The patent owner,

---

[4] K.G. Motors only argued claims 1, 4, 6, 23 and 27 separately.  A0811-A0841.  As such it has waived any argument to consider the patentability of the remaining claims separately.  *See In re Kao*, 639 F.3d 1057, 1065 (Fed. Cir. 2011) (refusing to consider the patentability a claim separately where the claim was not argued separately before the Board).

however, cannot meet this burden by merely providing evidence of gross sales of a commercial embodiment:

> In the present case, Huang has simply not provided sufficient information upon which the PTO could determine whether the grips were commercially successful. Although Huang's affidavit certainly indicates that many units have been sold, it provides no indication of whether this represents a substantial quantity in this market. This court has noted in the past that *evidence related solely to the number of units sold provides a very weak showing of commercial success, if any.*

*In re Huang,* 100 F.3d 135, 140 (Fed. Cir. 1996) (emphasis added).

Here, however, the Koziatek Declaration offers little more than gross sales, and provides no information regarding total market size, market scope, or market share. That evidence cannot establish commercial success. For example, K.G. Motors has provided no evidence that its allegedly patented rims sold better than other rims on the market, maintained their market share better than other rims, or increased in sales volume faster than the total market for tubeless rims. The record contains no evidence of the size of the bicycle wheel rim market at any point during the 2003-2012 sales period, nor is there any evidence of what percentage of that market is represented by K.G. Motors' sales. Absent some proof addressing these issues, as *Huang* held, one cannot determine whether or not the sales numbers provided by the K.G. Motors truly reflect "commercial success."

## B.     The Evidence of Purported Commercial Success Lacked a Nexus to the Claimed Invention.

Even assuming that the Koziatek Declaration had provided sufficient evidence to demonstrate commercial success in the market, it failed to establish the requisite nexus between any such success and the claimed invention.  An applicant asserting commercial success to support its contention of nonobviousness bears the burden of proof in establishing a nexus between the claimed invention and evidence of commercial success.  This Court has consistently held that "a proponent must offer proof 'that the sales were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter." *In re DBC,* 545 F.3d 1373, 1383 (Fed. Cir. 2008) (citing *In re Huang*, 100 F.3d 135,140 (Fed. Cir. 1996)).  "Evidence of commercial success . . . is only significant if there is a nexus between the claimed invention and the commercial success." *In re Galderma Labs.*, 737 F.3d 731, 740 (Fed. Cir. 2013) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006)).

"If the feature that creates the commercial success was known in the prior art, the success is not pertinent." *Id.*  Moreover, "[i]n considering evidence of commercial success, care should be taken to determine that the commercial success alleged is directly derived from the invention claimed, in a marketplace where the consumer is free to choose on the basis of objective principles, and that such

success is not the result of heavy promotion or advertising, shift in advertising, consumption by purchasers normally tied to applicant or assignee, or other business events extraneous to the merits of the claimed invention, etc." MPEP §716.03(b)(I).  Conclusory statements regarding commercial success due to the claimed invention have little probative value.  *See, e.g.*, *In Re DBC*, 545 F.3d at 1383 ("Here [Patent Owner] has done little more than submit evidence of sales."). The evidence submitted by K.G. Motors here was nothing more than a conclusory opinion by the inventor. Such evidence is legally insufficient:

> [The inventor's] affidavit contains a conclusory assertion that, in his opinion, the sales of the grips derive from the increased thickness of the polyurethane layer and the alignment of the pores. This merely represents the inventor's opinion as to the purchaser's reason for buying the product, and, alone, is insufficient. Instead, the applicant must submit some factual evidence that demonstrates the nexus between the sales and the claimed invention - for example, an affidavit from the purchaser explaining that the product was purchased due to the claimed features.

*In re Huang¸* 100 F.3d at 14-15.

### 1.    The Evidence Presented by K.G. Motors Utterly Fails to Establish the Nexus Required by this Court.

The Board erred by finding that the Koziatek Declaration established the requisite nexus.  Indeed, the record contains no information regarding what the precise dimensions of the so-called "first generation" rim were, what improvements were made to the alleged "patented rim" (such as materials, weight, cost, etc.) other than what is claimed in the '846 patent, what the "patented rim's"

relative performance was, or why customers may have purchased it. And as discussed below, there is no dispute that there was a large increase in advertising by K.G. Motors beginning with the introduction of the "patented rim" design.

Moreover, the evidence is completely silent as to whether customers responded in any way to a specific height of the sidewall in K.G. Motors' allegedly "patented rim." In *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011), a case involving a numerical range for a release rate of an opioid composition, this Circuit held that "if it is not established that the claimed novel range for a controlled release oxymorphone formulation causes commercial success where the prior art range would not, then it will be difficult to show the required nexus." While *Kao* was a pharmaceutical case, the logic of its holding is even more compelling in a mechanical case like this one. Here, no evidence suggests that the ***precise sidewall height dimensions*** recited in the '846 patent claims caused the purported commercial success of the "patented rims" described in the Koziatek Declaration.

The record in this case contains only one comparison of the effect of the claimed sidewall height on sales. Contrary to the generalizations in K.G. Motors' evidence, Specialized's evidence regarding its own sales specifically demonstrates that the claimed sidewall height did not affect sales in any way. Specifically, Specialized's 2009 Control Rim is the rim that K.G. Motors accused of infringing the '846 Patent. For 2010, Specialized made structural changes to the Control

Rim, increasing the sidewall height to 0.209 inches and increasing the bead seat angle to 3 degrees, which clearly took the new 2010 Specialized rim design outside the scope of the '846 patent. A0246 at ¶ 4. After these changes were made, the Specialized's sales continued to increase on a pace commensurate with the K.G. Motors increase in sales, and there was no noticeable decrease in rim performance or increase in consumer complaints. A0246-A0247 at ¶ 6. The Board even acknowledged – but improperly discounted – the fact that "the percentage growth of the [non-infringing] Control Rim sales is similar to the percentage growth of the" No Tubes rims. A0015. Also, and again in contrast to K.G. Motors' increase in advertising during the life of its product, the increase in Specialized's sales bore no relation to any increase in marketing efforts by Specialized because no such increase occurred. A0246-A0247 at ¶ 6.

In light of the evidence, it is clear that the patented features have little or no bearing on the sales of the products, and Specialized's sales growth of its own product lacking the claimed sidewall heights entirely rebut any presumption that Patent Owner's increase in sales resulted from the patented features. *See, e.g.*, *Media Techs. Licensing LLC v. Upper Deck Co.,* 596 F.3d 1334, 1339 (Fed. Cir. 2010) (showing of other factors unrelated to patented subject matter and essential to commercial success rebuts nexus presumption).

As in *Huang,* the evidence submitted by the inventor is inadequate to prove a nexus exists between any success of the Patent Owner's rims covered by the '846 Patent and the claimed invention.

### 2. The Board Explicitly and Erroneously Relies on a Prior Art Feature to Establish the Required Nexus

The Board explicitly focused on the sidewall height as driving the purported commercial success of the "patented rims."  A0016.  This was erroneous because the Board had already found that element of the patent squarely in the prior art Okajima '766 patent.  A0074.  It is black letter law that one may not consider "any commercial success that arose from features of a system found in the prior art as a consideration for non-obviousness*." Western Union Co. v. MoneyGram Payment Sys.*, 626 F.3d 1361, 1373 (Fed. Cir 2010) (citing *Ormco*, 463 F.3d at 1312 (Fed. Cir. 2006) ("If the feature that creates commercial success was known in the prior art, the success is not pertinent.")).  Specifically, the Board based its decision on a conclusion that "the evidence as a whole sufficiently relates the success of the rims to the height of the sidewalls."  A0016.  But it is undisputed, as the Board found elsewhere in the same decision, that the claimed sidewall height is found in Okajima '766.  A0005.  Therefore, even if there were evidence that the claimed sidewall height did have a nexus to commercial success, that success is "not pertinent."

**3.    The Media Citations Do Not Support a Finding of a Nexus Because They Prove That Any Commercial Success Arose From Non-Patented Features**

The Board erred by finding that the magazine articles attached to the Koziatek Declaration created the required nexus.  The magazine quotes and other evidence provided by K.G. Motors simply do not tie the sales to *the novel patented features*.  Indeed, one article notably refers to the sidewall height (the feature relied on by the Board) as nothing more than a "fringe benefit."  A0181-A0182.[5]

K.G. Motors also references an article from *Dirt Rag* magazine to allegedly demonstrate public appreciation of the claimed lower sidewall height.  *Id.* However, the article does nothing to prove that the claimed sidewall height dimension, on its own or in combination with a horizontally disposed flat bead seat and "ball and socket" fit, contributed to the sales of the rims.  *Id.*.  As stated in the article, the tires "mounted effortlessly due to the deep center channel of the rim, and the 28mm width provided a nice footprint for my 2.25" tires."  *Id.*  The article never ties the "effortless" mountability to a particular sidewall height dimension, and instead merely references a low sidewall height as a "fringe benefit."  *Id.* Significantly, nothing in the *Dirt Rag* article or any other reference relied upon by the Board article points to the precise claimed sidewall height of the patent as having any benefit whatsoever.

---

[5] Moreover, as discussed in the previous section, the particular sidewall height claimed in the '846 patent already existed in the prior art.

The cited articles, first and foremost, focus on NoTubes as a company, and specifically inventor Stanley Koziatek as a pioneer in developing the sealant feature for tubeless tire rims—an aspect of the rim design wholly irrelevant to the '846 patent—and one who "almost single-handedly" "created the tubeless tire sealant category." A0201. "Stan's is now the generic term for tire sealant, in the same way the brand name 'Xerox' means 'copy' and 'Kleenex' means 'facial tissues.'" A0200-A0201. While Mr. Koziatek's trademark counsel might object to this phrasing, his patent counsel must realize that it strongly implies that a significant aspect of NoTubes sales success is due to a non-patented feature of the rims.

In addition, other articles referenced by K.G. Motors cast significant doubt on whether the sales can be attributed to the claimed invention. A0183-A0184 (*Bike* magazine article stating "Stan's wheels are made to order with a variety of hub and spoke options" and "[t]hey have a welded seam and a shallow triangular profile with three internal channels for strength."); A0187-A0189 (*Cycling News* article emphasizing the light weight of K.G. Motor's own rims); and A0196-A0197 (*Mountain Bike Action* article stating that "the wide bead shelves are what hold the tire on the rim"). *Bike* magazine pointed out that "[factor] in that they cost less than many high-end pre-built wheels, and Stan's custom wheels are definitely worth a look." A0183-A0184. Such statements not only fail to provide any support for the

27

Board's nexus finding, they in fact provide strong evidence that other factors wholly unrelated to the '846 patent drove sales of the NoTubes rim.

### 4. K.G. Motors' Increased Marketing Campaign Obscures any Nexus Between the Patented Features and the Rims' Purported Commercial Success

The launching of a marketing campaign can obscure any nexus between the merits of the product and its commercial success. *McNeil PPC, Inc. v. L. Perrigo Co.,* 337 F.3d 1362, 1370 (Fed. Cir. 2003). Companies and individuals often choose selective marketing for a product so that the impact of such marketing is effective in selling the product. In this case, K.G. Motors admits to consistently increasing advertising and marketing efforts for its rims from 2004 to 2011. A0147-A0148 at ¶¶ 13-14. For convenience, a chart is provided below showing the increase in the number of distinct publications in which K.G. Motors advertised over time. Significantly, each publication is counted only once, even though the advertisements ran an average of six months each. The numbers provided by K.G. Motors show an increase in the number of publications from one in 2004 to ten in 2012.



Such an increase in marketing efforts over time obscures any conclusion of whether the commercial success is due to the rims incorporating the claimed invention or from other factors such as advertising.

### IV. The Board Erred by Concluding that Evidence of Commercial Success Outweighed the Strong *Prima Facie* Case of Obviousness.

The Board's ultimate finding of non-obviousness is reviewed de novo. This Court has repeatedly held that:

> [W]eak secondary considerations generally do not overcome a strong prima facie case of obviousness. . . . Here, where the inventions represented no more than "the predictable use of prior art elements according to their established functions," *KSR*, 550 U.S. at 417, the secondary considerations advanced by Western Union are inadequate to establish nonobviousness as a matter of law.

*Western Union Co. v. MoneyGram Payment Sys.*, 626 F.3d 1361, 1273 (Fed. Cir. 2010) (internal citations omitted); *see also Media Techs.* 596 F.3d at 1339 (Fed. Cir. 2010), ("Even if [the patentee] could establish the required nexus, a highly successful product alone would not overcome the strong showing of

obviousness."); *Leapfrog Enters.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (holding that secondary considerations presented, including commercial success, were inadequate to overcome a strong showing of obviousness that rendered the claims invalid).

In *Tokai v. Easton*, 632 F.3d 1358, 1370 (Fed. Cir. 2011), this Circuit noted that "even if [the patentee] could establish the required nexus, a highly successful product alone would not overcome the strong showing of obviousness." The *Tokai* decision went on to cite *KSR*'s holding that "the nature of mechanical arts is such that "identified predictable solutions" to known problems may be within the technical grasp of a skilled artisan." *Id.* at 1371 (citing *KSR*, 550 U.S. at 421).

The facts of this case compelling the prima facie obviousness found by the Board likewise compel such a finding no matter what secondary considerations may be mustered by K.G. Motors. Accordingly, even if the Koziatek Declaration were deemed to have probative value in evaluating the patentability of the claimed invention, the information provided does not outweigh the overwhelming evidence in the record that establishes the claimed invention as being obvious and therefore not patentable.

As noted above, the evidence establishing *prima facie* obviousness in this case is remarkably strong. The Okajima '307 patent discloses a bicycle rim having a visibly short sidewall, but does not explicitly recite the actual sidewall height.

But an earlier patent by the same inventor (Okajima '766) already taught a specific sidewall height falling within the scope of claim 1 of the '846 patent and within 0.002 inches of the scope of claim 23 of the '846 patent.

Accordingly, this case presents a strong case of *prima facie* obviousness and weak, if any, evidence probative of commercial success.  It follows that the Board erred as a matter of law in its ultimate conclusion that K.G. Motors' much weaker evidence of commercial success outweighed the overwhelming evidence of obviousness established in the record.  This Court owes no deference to that legal determination, and Specialized requests that the Board's conclusion of non-obviousness be reversed.

## CONCLUSION

The Board erred when it determined that K.G. Motors proved the secondary consideration of commercial success of the claimed invention.  It further erred when it determined that the purported commercial success outweighed the strong *prima facie* case of obviousness.  Accordingly, Specialized respectfully requests that this Court reverse the Board's 2014 Decision and hold all claims of the '846 patent obvious in light of the prior art.

Dated: July 6, 2015                   */s/ Jonathan H. Margolies*

Jonathan H. Margolies
jhmargolies@michaelbest.com
Katherine W. Schill
kwschill@michaelbest.com
Kevin P. Moran
kpmoran@michaelbest.com
MICHAEL BEST & FRIEDRICH LLP
100 E. Wisconsin Ave.
Milwaukee, WI  53202
Telephone: 414-271-6560
Facsimile: 414-271-0656

*Attorneys for Appellant*
*Specialized Bicycle Components, Inc.*

*Specialized Bicycle Components, Inc. v. K.G. Motors, Inc.*
*No. 15-1412*

## **ADDENDUM**

## **(Fed. Cir. R. 28(a)(12))**

1. Patent Trial and Appeal Board Decision on Appeal (Nov. 26, 2014)
   .................................................................................. A0001-A0021

2. U.S. Patent No. 7,334,846 ......................................... A0022-A0030

**Addendum 1**

Patent Trial and Appeal Board Decision on
Appeal (Nov. 26, 2014)


A0001-A0021



Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Pᴀᴛᴇɴᴛ ᴀɴᴅ Tʀᴀᴅᴇᴍᴀʀᴋ Oғғɪᴄᴇ

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,125 | 11/26/2008 | 7334846 | 2202214.121US4 | 8734 |

24395          7590          11/26/2014
WILMERHALE/DC
1875 PENNSYLVANIA AVE., NW
WASHINGTON, DC 20006

| EXAMINER |
|---|
| REIP, DAVID OWEN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3993 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/26/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SPECIALIZED BICYCLE COMPONENTS, INC.
Requester and Appellant

v.

Patent of K.G. MOTORS, Inc.
Patent Owner and Respondent

_____

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2
Technology Center 3900

_____

Before ROMULO H. DELMENDO, JEFFREY B. ROBERTSON, and
DANIEL S. SONG, *Administrative Patent Judges*.

ROBERTSON, *Administrative Patent Judge*.

DECISION ON APPEAL

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

This is a decision under 37 C.F.R. § 41.77(f).  In a Decision on
Appeal mailed February 28, 2012, Appeal No. 2011-010680 (hereinafter
"Original Decision" or "Orig. Dec."), we reversed the Examiner's decision
not to adopt Requester's proposed grounds of rejection of claims 1-29 over
certain prior art and designated the proposed grounds as new grounds of
rejection pursuant to 37 C.F.R. § 41.77(b).  ("Orig. Dec." 2, 5, 6, 25–26.)  In
response, Patent Owner K.G. Motors, Inc. filed a Request to Reopen
Prosecution under 37 C.F.R. § 41.77(b)(1) on May 29, 2012 (hereinafter
"Request" or "PO Req.").

The Request presented new evidence in the form of a Declaration
under 37 C.F.R. § 1.132 of Mr. Martin Sacks (hereinafter "Sacks
Declaration"), a Declaration under 37 C.F.R. § 1.132 of Mr. Stanley
Koziatek (hereinafter "Koziatek 132 Declaration"), a Declaration under 37
CFR § 1.131 of Mr. Stanley Koziatek (hereinafter "Koziatek 131
Declaration"), and a Declaration under 37 C.F.R. § 1.132 of Ms. Marie-
Hélène Prémont (hereinafter "Prémont Declaration").  (PO Req. 2.)

Third Party Requester Specialized Bicycle Components, Inc. filed
comments under 37 C.F.R. § 41.77(c) on June 28, 2012 (hereinafter "Req'r
Resp."), including a Declaration under 37 C.F.R. § 1.132 of Mr. Jeremy
Thompson (hereinafter "Thompson Declaration") and a Declaration under
37 C.F.R. § 1.132 of Mr. Joseph Buckley (hereinafter "Buckley
Declaration"), urging that the new evidence did not overcome the new
ground of rejection.

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

In the Examiner's Determination pursuant to 37 C.F.R. § 41.77(d), the Examiner determined that the Board's analysis with respect to obviousness was maintained and that the evidence of secondary considerations was insufficient to outweigh the evidence of obviousness (Examiner's Determination mailed November 19, 2012, hereinafter "Ex. Det.", at 6-8). The Examiner determined that the Declaration under 37 C.F.R. § 1.131 was insufficient to antedate prior art applied in the rejections. (Ex. Det. 8-15.)

Both Patent Owner and Requester filed comments under 37 C.F.R. § 41.77(e). (Patent Owner Comments filed December 19, 2013 (hereinafter "PO 1st 41.77(e) Comments") and January 9, 2014 (hereinafter "PO 2nd 41.77(e) Comments"); Requester Comments filed December 10, 2013 (hereinafter "Req'r 1st 41.77(e) Comments") and January 16, 2014 (hereinafter "Req'r 2nd 41.77(e) Comments").)

We have reconsidered the matter based on all the relied-upon arguments and evidence, including the new evidence and comments related thereto. Having done so, we REVERSE the Examiner's decision to maintain the new grounds of rejection set forth in the Original Decision. *See* 37 C.F.R. § 41.77(f).

## STATEMENT OF THE CASE

In the Original Decision, we reversed the Examiner's decision not to reject claims 1-29, and as a result entered the following grounds of rejection by operation of 37 C.F.R.§ 41.77(b):

II.    Claims 1–3, 7, 8, 12, 20–26, 28, and 29 under 35 U.S.C.
§ 103(a) as being obvious over Okajima '307[1] in view of
Okajima '766;[2]

III.   Claims 4, 5, 9, 10, and 27 under 35 U.S.C. § 103(a) as being
obvious over Okajima '307 in view of Chen[3] and Veux,[4] or
Okajima '307 in view of Okajima '766 in view of Chen;

IV.    Claims 6 and 19 under 35 U.S.C. § 103(a) as being obvious
over Okajima '307 in view of Okajima '766, further in view of
Chen;

V.     Claim 11 under 35 U.S.C. § 103(a) as being obvious over
Okajima '307 in view of Tien[5] or Veux, or Okajima '307 in
view of Okajima '766, further in view of Veux;

VI.    Claim 13 under 35 U.S.C. § 103(a) as being obvious over
Okajima '307 in view of Chen or Okajima '307 in view of
Okajima '766 further in view of Chen or Veux; and

VII.   Claims 14–18 under 35 U.S.C. § 103(a) as being obvious over
Okajima '307 in view of Okajima '766 or Veux.

(Orig. Dec. 5-6.)

For convenience, we reproduce claim 1 below:

    1. A bicycle wheel rim onto which a tubeless tire can be
mounted, comprising:

---

[1] Okajima '307          US 7,090,307 B2          Aug. 15, 2006
[2] Okajima '766          US 6,568,766 B1          May 27, 2003
[3] Chen                  US 6,402,255 B1          June 11, 2002
[4] Veux                  US 7,104,300 B2          Sep. 12, 2006
[5] Tien                  US 6,752,187 B1          June 22, 2004

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

       a base portion having a proximal surface engageable with a spoke member and an opposing distal surface engageable with a surface of a tire bead of the tubeless tire, wherein the distal surface has a trough, and, in cross sectional profile, a flat bead seat immediately adjacent and contiguous with the trough to an intersection point with a respective sidewall surface such that the tire bead rests on the flat bead seat when mounted; and

       an integral sidewall extending from an intersection of the proximal surface and the distal surface, wherein a most distal point of the sidewall extends no further than 0.200 inches above the flat bead seat of the distal surface of the rim,

       wherein the bead seat is horizontally disposed with respect to an axial direction of the rim so that when the tire is mounted, the tire bead is pressed between the flat bead seat and the sidewall to provide a ball and socket fit.

(Req. App. Br. 59, Claims App'x.)

Claim 23 recites a bicycle wheel rim having a sidewall between 0.150 inches to 0.175 inches.  (Req. App. Br. 61, Claims App'x.)

## ISSUE

In the rejections set forth in the Original Decision, we noted that Okajima '307 was silent as to the sidewall heights recited in the independent claims, that Okajima '766 disclosed sidewall heights significantly overlapping the range of claim 1, and that the difference between the lowest endpoint of the range disclose in Okajima '766 and the upper endpoint of the range disclosed in claim 23 was 0.0002 inches.  (Orig. Dec. 16–17.)  We agreed with Requester that it would have been obvious for one of ordinary skill in the art to have turned to Okajima '766 for guidance in determining

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

an appropriate sidewall height for the sidewalls of the rims disclosed in Okajima '307.  (Orig. Dec. 16.)

Patent Owner contends that the Koziatek 131 Declaration antedates Okajima '307 and, therefore, Okajima '307 is not available as prior art.  (PO Req. 3.)  Patent Owner contends further that the Sacks Declaration, citing International Standard ISO 5775-1 for bicycle tires and rims (hereinafter "Standard") provides evidence that one of ordinary skill in the art would not have combined the teachings of Okajima '307 with Okajima '766 to arrive at the bicycle wheel rims having the features recited in the claims.  (PO Req. 4–14.)  Patent Owner argues that the Koziatek 132 Declaration provides evidence of secondary considerations, particularly commercial success, and unexpected results.  (PO Req. 14–17.)

Requester contends that Patent Owner's own evidence proves that the invention was conceived after the filing date of Okajima '307.  (Req'r Resp. 4–9.)  Requester contends further that the secondary considerations evidence and arguments provided are factually deficient or irrelevant to overcome the obviousness analysis, relying on the Thompson Declaration for support.  (Req'r Resp. 9–14.)  Requester argues that Patent Owner's evidence of secondary considerations is inadequate to outweigh the evidence of obviousness, citing to the Thompson Declaration and Buckley Declaration.  (Req'r Resp. 15–25.)

The Examiner considered Patent Owner's arguments including all declarations and maintained the rejections.  (Ex. Det. 6.)

Assuming that Okajima '307 is available as prior art, the dispositive issue is:

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

Is Patent Owner's Declaration evidence under 37 C.F.R. § 1.132 when viewed with the prior art of record sufficient to weigh in favor of a conclusion of non-obviousness?

ANALYSIS

*Ground II-Combination of Okajima '307 and Okajima '766*

We are unpersuaded by Patent Owner's evidence that one of ordinary skill in the art would not have turned to Okajima '766 in order to determine an appropriate sidewall height for the rims disclosed in Okajima '307.

Patent Owner, through reference to the Sacks Declaration and the Standard, contends that the rim disclosed in Okajima '766 is considered to be a crochet style rim, one of the three rim design categories disclosed in the Standard, and that the rim of Okajima '307 does not fall within one of such rim design categories. (PO Req. 4–5; Sacks Declaration paras 26–30; *see also* PO 1st 41.77(e) Resp., 12–17.) Thus, Patent Owner contends that one of ordinary skill in the art would not have turned to Okajima '766 to select a sidewall height for use in Okajima '307, because Okajima '766 is directed to a crochet style rim as defined by the Standard, while Okajima '307 deviates from the Standard. (PO Req. 9, 10; Sacks Declaration para. 43.)

We do not agree with Patent Owner's argument. As argued by Requester, the Standard cited by Patent Owner provides recommendations for purposes of designing standard rims and tires to fit with one another, but the Standard is not always followed in designing rims, as evidenced by Okajima '307. (Req'r Resp. 10; Thompson Declaration, para. 4.) Therefore, one of ordinary skill in the art, in selecting a sidewall height to apply to the rims of Okajima '307, would not be compelled necessarily to follow the

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

Standard, because one of ordinary skill in the art would have understood that Okajima '307 does not follow the Standard, the Standard providing only recommendations for bicycle rims.

Moreover, we are not persuaded by Patent Owner's argument that the dimensions $D_1$ and $D_2$ in Okajima '766 are interrelated and taught to act in concert, such that one of ordinary skill in the art would not have selectively relied on only the dimension of $D_2$ to apply to Okajima '307, because that dimension is actively tied to the tire receiving recess. (PO Req. 7–9.)

For convenience, we reproduce FF6 from the Original Decision (Orig. Dec. 12–13):

6. Figure 5 of Okajima '766 is reproduced below:



Fig.5

Figure 5 above depicts a partial cross-sectional view of the outer portion of a bicycle rim 24 with annular side portions 50,

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

> with imaginary line $L_1$ passing through a pair of outer corners
> 62a, imaginary line $L_2$ passing through the outer peripheral
> edges of the annular side portions 50, where $L_1$ and $L_2$ are
> spaced apart by distance $D_2$ of about 4.5 to about 6.5
> millimeters.  (Col. 4, ll. 1–6; col. 7, ll. 16–33.)

Specifically, Patent Owner argues that at the time of the '846 Patent,
the general thought was to use a higher sidewall height ($D_2$) or a deeper
recess ($D_1$) to give ample room for the tire bead, such that if the bead seat is
flat with no recess, then the height of the sidewall would have been
increased correspondingly.  (PO Req. 10; Sacks Declaration para. 46.)
Patent Owner argues further that one of ordinary skill in the art would have
considered a sidewall height of 0.200 inches to be extremely short and
making the bead seat area even smaller by not providing an angled bead seat
was unheard of in the industry according to the Sacks Declaration.  (PO Req.
10–11; Sacks Declaration para. 46–47.)

However, Requester has provided evidence that Okajima '766 does
not require that the bead seat and the short sidewall to be taken together and
that although dimension $D_1$ nor $D_2$ act in concert, neither dimension $D_1$ nor
$D_2$ requires a slanted bead seat.  (Req'r Resp. 11–12; Thompson Declaration
paras. 5–7; Req'r 2nd 41.77(e) Comments 9-10.)  In addition, the Thompson
Declaration states that there are several ways to adjust the drop center depth
($D_1$) without angling the bead seat, which were well known prior to 2003.
(Thompson Declaration para. 6.)  In response to Patent Owner's declaration
evidence that short sidewalls had not previously been used in combination

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

with flat bead seats prior to the '846 Patent, Requester cites to Okajima '766 for the position that short sidewalls had been used with flat bead seats. (Req'r Resp. 12–13; Thompson Dec. 7.)  Thus, according to Requester the sidewall height of the rims in Okajima '307 would be a matter of design choice for the bicycle wheel rim.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007)  ("When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one.  If a person of ordinary skill can implement a predictable variation, §103 likely bars its patentability.")

        We acknowledge that Mr. Sacks has significant experience in the bicycle industry, and is qualified to opine as to the knowledge of one of ordinary skill in the art in the field of bicycle rims.  (Sacks Declaration, paras. 3–16.)  We also find that Mr. Thompson has sufficient experience in the bicycle wheel rim field and is qualified to opine as to the knowledge of one of ordinary skill in the art in the field of bicycle rims.  (Thompson Declaration para 1.)

        In view of the evidence of record, we credit the explanations of the Thompson Declaration over the explanations set forth in the Sacks Declaration.  Particularly, Okajima '307 is acknowledged to be a rim that does not fall within a category of rims cited in the Standard.  One of ordinary skill in the art would have had to rely on the knowledge in the art regarding sidewall heights in bicycle rims, for guidance, including rims of a different "type" according to the Standard, e.g., Okajima '766, for sidewall heights to employ in the rims disclosed in Okajima '307.  We, therefore, agree with Requester that it would have been obvious to one of ordinary skill

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

in the art, starting with Okajima '307, to have turned to the sidewall height of Okajima '766 in the rim of Okajima '307. (Req'r Resp. 10; Thompson Declaration, para. 7; Req'r 2nd 41.77(e) Comments 9.)

We have considered Patent Owner's other arguments, including that line $D_2$ in Okajima '766 is imaginary and does not corresponds to sidewall height, but find them to be without merit. (*See* Orig. Dec. 16–17; Thompson Declaration, para. 5.)

*Secondary Considerations*

Patent Owner contends that rims having the features of the claims exhibit commercial success due to significant sales, such that there is a presumed nexus between the claimed features, a position that is further supported by praise from multiple articles. (PO Req. 14; PO 1st 41.77(e) Comments 21–24.) Patent Owner has presented evidence that purports to show unexpected results in the form of tests comparing a "NoTubes ZTR Olympic rim" with a "prior art style rim" allegedly showing an unexpected criticality for the claimed heights and combination of elements. (PO Req. 15–17; PO 1st 41.77(e) Comments 24–25.)

Requester contends that the evidence of sales is inadequate and that the Koziatek 132 Declaration does not establish a nexus between the alleged commercial success and the claims. (Req'r Resp. 15.) Specifically, Requester contends that Patent Owner offers only gross sales numbers, and has not shown the sales of the rims in relation to the market, and that such sales are not out of the ordinary for the market at the time. (Req'r Resp. 16; Req'r 2nd 41.77(e) Comments 13–14.) In addition, Requester argues that a

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

portion of the sales relied on by Patent Owner are directed to sales of rims
that fall outside the claims of the '846 Patent. (Req'r Resp. 16.) Requester
contends that the Buckley Declaration establishes that the patented features
have no bearing on the sales of the product, and that factors such as the
overall market increase in demand for bicycle rims, as well as marketing
contributed to the increase in sales. (Req'r Resp. 17–19.) Further,
Requester argues that the publications cited by Patent Owner do not tie the
sales to the patented features. (Req'r Resp. 18; Req'r 2nd 41.77(e)
Comments 14–15.)

As to Patent Owner's evidence of unexpected results, Requester
argues that the C-clamp test results are insufficient because: the results do
not compare the closest prior art; there is insufficient evidence as to the
relevancy of the C-clamp test; Patent Owner's contention that a rim with a
higher sidewall will hold a tire better is not correct; and a horizontal bead
seat would have been expected to hold a tire better. (Req'r Resp.19–23.)
Requester further contends that Patent Owner's declaration evidence is
opinion evidence that is entitled to little weight and is insufficient to
overcome the evidence of obviousness on the record. (Req'r Resp. 25.)

The Examiner agreed with and incorporated by reference Requester's
arguments, determining that Patent Owner's evidence fails to outweigh the
evidence of obviousness. (Ex. Det. 7–8.)

PRINCIPLES OF LAW

Once a prima facie case of obviousness has been established,
objective evidence of secondary considerations must be considered in

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

making an obviousness decision. *See Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983). *See also In re Rinehart*, 531 F.2d 1048, 1052 (CCPA 1976); *In re Eli Lilly & Co.*, 902 F.2d 943, 945 (Fed. Cir. 1990).

A "nexus" must be established between the merits of the claimed invention and the evidence of secondary considerations in order for the evidence to be given substantial weight. *See In re GPAC, Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). The scope of the "objective evidence of non-obviousness must be commensurate in scope with the claims which the evidence is offered to support." *In re Tiffin*, 448 F.2d 791, 792 (CCPA 1971); *see also In re Peterson*, 315 F.3d 1325, 1329-31 (Fed. Cir. 2003).

Further, in order to prove unexpected results, the invention must be compared with the closest prior art. *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991).

*Commercial Success*

Patent Owner relies on the Koziatek 132 Declaration, which sets forth a Table of rims sold between 2003 and 2011. (Koziatek 132 Declaration para. 6.) The Koziatek 132 Declaration states that the growth of sales since 2004, when the patented rims were first sold, has been substantial, totaling 350,000 rims. (*Id.*) According to the Koziatek 132 Declaration, the compound annual growth rate from 2005, the first full year after launching the patented rims, until 2011, was 43.25%, and for 2012, the continued growth was approximately 59.62% compared to January to April 2011. (Koziatek 132 Declaration para. 7.) The Koziatek 132 Declaration identifies

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

the rims accounting for the sales data from 2004–2011 and identifies each of
the features recited in claims 1 and 23 in the rims sold.  (Koziatek 132
Declaration para. 11, Ex. A–L.)  The Koziatek 132 Declaration asserts that
the sales data pertains only to sales of the rims such that there is a nexus
between the commercial success and the patented invention.  (Koziatek 132
Declaration para. 12.)  Accordingly, we are persuaded that the sales of the
rims in the "UNITS SOLD OF PATENTED RIMS" column in paragraph 6
of the Koziatek 132 Declaration correspond to rims having the features
recited in claims 1 and 23.

Requester presented evidence of sales of their "Control Rim" over the
time period of 2009–2012, which is alleged to be a rim was accused of
infringing the '846 Patent, and that beginning in the model year 2010 had a
sidewall height of 0.209 inches and a flat bead seat oriented 3 degrees from
horizontal.  (Buckley Declaration paras. 4-5.)  According to the Buckley
Declaration, rim sales from the Control Rim increased by 48% both from
2009 to 2010 and 2010 to 2011.  (Buckley Declaration para. 5.)  From 2011
to 2012, sales of the Control Rim increased by 83%.  *Id.*

Comparing the percentage growth of rim sales of the Control Rim
with rims of the Patent Owner having the features recited in claims 1 and 23,
the percentage growth of the Control Rim sales is similar to the percentage
growth of the sales of the rims of the Patent Owner having the features
recited in claims 1 and 23.  Both Patent Owner and Requester provide
statements that the success of the rims has not been due to the amount of
advertising employed to market the respective rims.  (Koziatek 132
Declaration paras. 13–15; Buckley Declaration, para. 6.)  Although the

14

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

percentage growth of the Control Rim and rims of the Patent Owner having
the features recites in claims 1 and 23, the amount of units sold of the rims
having the features recited in claims 1 and 23 is substantially more than the
amount of Control Rim units sold, with 129,903 units sold compared to 3376
of Control Rim units sold in 2011 alone.

    We are not persuaded by Requester's argument that the publications
cited by Patent Owner do not tie the sales to the patented features. (Req'r
Resp. 18.) In our view, the evidence provided by Patent Owner is sufficient
to relate the success of the rims to the features recited in claims 1 and 23.
Although the excerpt from Exhibit M to the Koziatek 132 Declaration, an
article from Dirt Rag Magazine, characterizes the sidewall height of "2-3
mm lower than traditional rims which is said to reduce pinch flats" as a
"fringe benefit," and certain portions of Exhibits N, P, and R discuss other
features, such as hub and spoke options, the weight of the rims, and wide
bead shelves, the evidence as a whole sufficiently relates the success of the
rims to the height of the sidewalls.

    For example, Exhibit N to the Koziatek 132 Declaration, an article
from Bike Magazine states: "Compared to standard tube rims, the Flow's
[ZTR Flow Rim, Exhibit J to the Koziatek 132 Declaration, having the
recited features of claim 1] sidewalls are a few millimeters lower, making
them lighter and a little stiffer." (Koziatek 132 Declaration para. 18; Ex. N.)
Thus, while Requester is correct that the Bike Magazine article discusses the
weight of the rim, it does so in relation to the sidewall height, which the
article agreed reduces pinch flats, decreases rolling resistance, and allows
the tire to be run at lower tire pressures. (*Id.*)

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

Exhibit O to the Koziatek 132 Declaration, an excerpt from New
Zealand Mountain Biker relating to the ZTR Olympic Rim, Exhibit G to the
Koziatek 132 Declaration and having the features of claims 1 and 23, states:
"Stan NoTubes proprietary design with Bead Socket Design allow[s] a much
lower sidewall that locks the tyre's bead in place and creates an airtight seal
due to the rim's inner curve." (Koziatek 132 Declaration para. 18; Ex. O.)
Further, Exhibit T to the Koziatek 132 Declaration, an article from
SingleTrack.com states: "Before anyone else in the industry thought to even
consider the concept, Koziatek was making rims with short sidewalls and
minimal bead hook, specifically for tubeless tires setups." (Koziatek 132
Declaration para. 23; Ex. T.) Similar statements regarding the sidewall
height appear in the other exhibits to the Koziatek 132 Declaration. (*See*
Exs. Q, R, S, and U.)

We are of the view that the evidence of record supports the position
that the success of the rims relates to the features recited in claims 1 and 23,
particularly the sidewall height, which is the feature missing from Okajima
'307.

*Unexpected Results*

As evidence of unexpected results, Patent Owner performed a "c-
clamp" test, allegedly comparing the ability of a rim falling within claims 1
and 23, the ZTR Olympic Rim, Exhibit G to the Koziatek 132 Declaration
and having the features of claims 1 and 23, with a rim "very similar to
Okajima '766" employing a rim with an angled bead seat and a sidewall
height of 0.238 inches. (Koziatek Declaration, paras. 31–38; Exs. G, V, W.)

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

The c-clamp test allegedly demonstrates that the rims according to the
claims unexpectedly do not cause tires to lose air and become dislodged
from the rim.  (Koziatek Declaration, paras. 35–38.)

However, we agree with Requester, that the c-clamp test fails to
compare the closest prior art.  (Req'r. Resp. 20–21.)  That is, as discussed
above, Patent Owner stresses the difference between the crochet-style rims
of Okajima '766 and the rims of Okajima '307.  (*See*, e.g., Sacks Declaration
paras. 43, 47.)  Thus, according to Patent Owner's other evidence, the rims
of Okajima '307, therefore, would constitute the closest prior art for
comparing the rims recited in claims 1 and 23.  In this regard, Patent
Owner's statement that the rim of Okajima '307 was not chosen due to the
lack of disclosure of sidewall height is not persuasive.  (Koziatek 132
Declaration, para. 33.)  Patent Owner relies on other evidence regarding
what one of ordinary skill in the art would have done in order to determine
the sidewall heights with respect to Okajima '307.  (*See*, e.g., Sacks
Declaration paras. 47, 49.)  That Okajima '307 is silent as to sidewall height,
does not justify relying on a different rim as the closest prior art.

Therefore, the c-clamp test does not provide strong evidence of
unexpected results of the rims recited in the claims.

*Weighing the Evidence as a Whole*

After having discussed the evidence both for and against the
obviousness of claims 1 and 23, on balance, we are of the view that the
evidence against the obviousness of claims 1 and 23 outweighs the evidence
in favor of obviousness of the claims.  That is, although the evidence of

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

record both for and against whether one of ordinary skill in the art would have combined Okajima '307 with Okajima '766, weighs in favor of supporting the combination, the evidence of commercial success sufficiently outweighs the balance of evidence in favor of the combination. Specifically, the significant sales of rims having the features recited in claims 1 and 23, coupled with the articles emphasizing the features recited in the claim, in particular the sidewall height, the very point of the combination Okajima '307 with Okajima '766, are of sufficient weight to render the claims non-obviousness.

### Grounds III-VII

Because all of the new grounds of rejection rely on the combination of Okajima '307 and Okajima '766, we reverse the Examiner's decision to maintain Grounds III-VII for the same reasons. In this regard, the other references do not add any additional disclosure to change the weighing of evidence as discussed supra.

### Okajima '307 as Prior Art

Patent Owner has submitted a Declaration under 37 C.F.R. § 1.131 of Mr. Koziatek in an effort to antedate Okajima '307. (PO Req. 3.) In view of our conclusion with respect to obviousness discussed above, we find it unnecessary to reach the issue of whether Okajima '307 is prior art.

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

## CONCLUSION

On this record, we find that the evidence of secondary considerations outweighs the evidence in support of obviousness.


## DECISION

The Examiner's Decision to maintain the new grounds of rejection set forth in the Original Decision is reversed.

Requests for extensions of time in the *inter partes* reexamination proceedings are governed by 37 C.F.R. § 1.956. *See* 37 C.F.R. § 41.79.

In the event neither party files a request for rehearing within the time provided in 37 C.F.R. § 41.79, and this decision becomes final and appealable under 37 C.F.R. § 41.81, a party seeking judicial review must timely serve notice on the Director of the United States Patent and Trademark Office. See 37 C.F.R. §§ 90.1 and 1.983.


## REVERSED

Appeal 2014-002865
Reexamination Control 95/001,125
Patent 7,334,846 B2

PATENT OWNER:

WILMERHALE/DC
1875 PENNSYLVANIA AVE., NW
WASHINGTON, DC 20006


THIRD-PARTY REQUESTER:

KEVIN P. MORAN
MICHAL BEST & FRIEDRICH LLP
100 EAST WISONSIN AVE.
MILWAUKEE, WI 53202

**Addendum 2**

U.S. Patent No. 7,334,846

A0022-A0030



US007334846B2

(12) **United States Patent**    (10) **Patent No.:**    **US 7,334,846 B2**

Koziatek    (45) **Date of Patent:**    **Feb. 26, 2008**

(54) **BICYCLE WHEEL RIM**

(76) Inventor:  **Stanley F. Koziatek**, 305 River Rd., Corning, NY (US) 14830

( * ) Notice:  Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 5 days.

(21) Appl. No.: **10/959,743**

(22) Filed:  **Oct. 6, 2004**

(65)  **Prior Publication Data**

US 2006/0071540 A1    Apr. 6, 2006

(51) **Int. Cl.**
  **B60B 21/02**    (2006.01)

(52) **U.S. Cl.** ........................... **301/95.104**; 301/95.106; 152/382

(58) **Field of Classification Search** .................. 301/58, 301/95.101, 95.104, 95.105, 95.106, 95.107, 301/95.108; 152/516, 520, 382
  See application file for complete search history.

(56)  **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,194,177 A * | 8/1916 | Henderson | 152/382 |
| 1,316,773 A * | 9/1919 | Daigre | 152/327 |
| 1,551,445 A * | 8/1925 | Wagonhorst | 152/381.6 |
| 4,896,921 A * | 1/1990 | Sato et al. | 301/5.1 |
| 6,183,047 B1 * | 2/2001 | Kuhl | 301/95.106 |
| 6,283,557 B1 * | 9/2001 | Okajima et al. | 301/95.104 |
| 6,402,255 B1 * | 6/2002 | Chen | 301/95.101 |
| 6,402,256 B1 * | 6/2002 | Mercat | 301/95.104 |
| 6,428,115 B1 | 8/2002 | Chen | |
| 6,457,501 B1 * | 10/2002 | Ball | 152/379.3 |

| | | | |
|---|---|---|---|
| 6,568,766 B1 * | 5/2003 | Okajima et al. | 301/95.104 |
| 6,736,462 B1 | 5/2004 | Okajima | |
| 6,752,187 B1 | 6/2004 | Tien | |
| 6,761,847 B2 | 7/2004 | Meggiolan | |
| 6,767,069 B2 | 7/2004 | Chen | |
| 6,767,070 B1 | 7/2004 | Chiang et al. | |
| 6,776,460 B1 | 8/2004 | Lo | |
| 6,817,680 B2 * | 11/2004 | Chen | 301/95.104 |
| 6,938,962 B1 * | 9/2005 | Schlanger | 301/58 |
| 7,083,239 B2 * | 8/2006 | Okajima | 301/95.108 |
| 7,090,307 B2 * | 8/2006 | Okajima | 301/95.107 |
| 2003/0025383 A1 * | 2/2003 | LaCombe et al. | 301/95.101 |
| 2003/0150538 A1 | 8/2003 | Ceretta | |
| 2004/0004391 A1 * | 1/2004 | Fioravanti | 301/95.104 |
| 2004/0095014 A1 * | 5/2004 | Veux et al. | 301/58 |

* cited by examiner

*Primary Examiner*—Russell D. Stormer

(74) *Attorney, Agent, or Firm*—Sughrue Mion, PLLC

(57)  **ABSTRACT**

A bicycle wheel rim having a circular base portion including a proximal surface and a distal surface, and a pair of integral sidewalls extending generally radially outward from an intersection region of the proximal surface and the distal surface. The distal surface of the rim has a central hump, a trough contiguous with the central hump extending axially outward from the hump, and a flat shelf immediately adjacent, contiguous with, and extending axially outward from the trough. Another embodiment of the invention is directed to a bicycle wheel including the embodied rim, a plurality of spokes engaged at respective ends thereof with the rim and a hub engaged with the plurality of spoke members at opposite ends thereof. Another embodiment of the invention is directed to a bicycle wheel assembly comprising the embodied wheel and a tube and/or tire mounted on the rim.

**29 Claims, 4 Drawing Sheets**





**FIG.1**
Prior Art



**FIG.2**



FIG.3



FIG.4

U.S. Patent         Feb. 26, 2008        Sheet 3 of 4         US 7,334,846 B2



FIG.5

FIG.6

FIG.7



FIG.8

US 7,334,846 B2

**1**

## BICYCLE WHEEL RIM

### BACKGROUND OF THE INVENTION

1. Field of the Invention

Embodiments of the invention are directed to the field of bicycle wheel rims and, more particularly, to a lighter, stronger and otherwise improved rim for tires with or without tubes.

2. Description of Related Art

The rim is the outer, usually metal, hoop of a bicycle wheel. The spokes of a bicycle wheel extend between a central hub of the wheel and the rim. An inflatable tube and/or tire are positioned around the exterior of the rim and air is introduced through a valve mechanism to inflate the tube and/or tire on the rim as a functional part of a bicycle.

A prior art rim including a mounted, inflated tire is shown in cross section in FIG. 1 to illustrate conventional rim construction. The rim **100** has a base portion **101**, which holds the distal portion of a spoke assembly **102**. The base portion extends upward in the form of a Y to a point **103**. A mounting surface **104** of the rim has a generally concave profile and extends between, and connects to, opposing points **103**. Sidewalls **105** extend outwards from points **103** and terminate in bead lock region **106**. Tire **110** has tire bead regions **112**. In an uninflated state, the tire bead regions **112** loosely rest on rim surface **104** in the region between sidewalls **105**. Upon inflation, the bead portions ride up the surface **104** until they sealingly engage sidewalls **105**. Due to the construction of the tire bead **112**, the bead lock regions **106** help to stabilize the engagement of the tire with the rim. Many variations of rim designs are known to those skilled in the art. However, the great majority of rims will have the basic portions illustrated in FIG. 1.

The dimensions of various portions of a bicycle rim can significantly influence rim function. For example, weight is a significant consideration in a racing or touring rim. In addition to material considerations, rim parameters such as the inside distance between the rim sidewalls will largely determine useable tire size, the ability to use an inner tube within the tire, rim strength, the effect of forces on the rim during various maneuvers such as turning, braking, etc., and others. The shape of the surface **104** may significantly influence the ease of tube/tire mounting and tube/tire inflation. The height, shape and thickness of the rim sidewalls will contribute to overall rim weight, strength, tire stability, air leakage, and other considerations appreciated by those skilled in the art.

Several issues can be identified with respect to conventional rim construction and dimensions. Rim sidewalls typically have a height dimension, shown as H in FIG. 1, between about 0.225 inch to ≧0.265 inch for a conventional bicycle rim. As the dimension H increases, so does the mechanical leverage of the tire on the rim. The greater leverage resulting from a higher sidewall further increases the forces acting in the region of point **103** of the rim shown in FIG. 1, thus requiring additional support at points **103** in the form of more material and increased rim weight. A higher sidewall dimension, H, promotes greater flexing of the rim and may result in cracking or stress fracture of the rim material. In addition, as rim sidewall height, H, increases, available tire inflation volume decreases while inflation pressure increases. Moreover, less tire surface is available resulting in decreased traction and other disadvantages. Another consequence of high sidewalls and various bead lock sizes and shapes is the well known "pinch flat" or "snake bite" that may be caused when the tube or tire gets

**2**

pinched between the rim and a hard, sharp object such as a rock, curb stone or the edge of a pothole, for example. An under-inflated tire also contributes to a pinch flat occurrence. A too soft, or too narrow (for the rim) tire more easily lets the tire bottom out when striking an obstruction resulting in the pinch holes from the bead locks or distal portion of the sidewall.

Several issues to be considered with respect to rim surface **104** as shown in FIG. 1 include rim strength, the ability to uniformly position the tire bead region on the rim prior to inflation and the ease of tire inflation, particularly with a manual pump, the interchangeable use of tubes and/or tubeless tires, and others recognized in the art. In light of the known shortcomings of conventional bicycle rim designs, such as those set forth above and others known to those skilled in the art, the inventor has recognized a need for an improved rim that addresses these disadvantages and additionally results in a lighter, stronger, more versatile, better performing and cost effective rim for the rider.

### SUMMARY OF THE INVENTION

An embodiment of the invention is directed to a bicycle wheel rim. The rim is intended to have an inner tube and/or a tire mounted onto the rim. The rim has a circular base portion consisting of a proximal surface (i.e., the surface facing the wheel hub, which as part of a wheel assembly engages a plurality of spoke members, the other ends of which are attached to the hub of the wheel assembly), and a distal surface (i.e., the radially outwardly facing surface with respect to the hub), which is the surface that engages the inner tube or the bead of a tire prior to inflation. The distal surface of the rim has a central hump, a trough contiguous with the central hump extending axially outward from the hump, and a flat shelf immediately adjacent, contiguous with, and extending axially outward from the trough. The rim further includes an integral sidewall extending generally radially outward from an intersection region of the proximal surface and the distal surface of the base portion of the rim. A distal point (i.e., farthest, free end) of the sidewall extends no further than 0.200 in above the shelf of the distal surface of the rim. It will be readily appreciated that the rim consists of two opposing sidewalls and that the distal surface of the base portion consists of a central hump, a trough on each axial side of the hump, and a flat shelf extending axially from each trough out to the intersection region with the proximal surface of the base portion. In an aspect, the distal point of the sidewall extends above the shelf in the range of between about 0.150 in to 0.195 in. In another aspect, the distal point of the sidewall extends only to between about 0.171 in to 0.175 in above the shelf. These dimensional ranges present a sidewall having a height, hereinafter denoted by H, that is on the order of 2 millimeters less than the sidewall height of a conventional bicycle wheel rim. A shorter sidewall as embodied herein not only results in a reduction in the weight of the rim, it also reduces the mechanical leverage that the tire has on the rim, making the rim stiffer and potentially longer lasting by eliminating flexing of the rim, which can lead to cracking. This feature also eliminates the need for corner reinforcement of the rim. Further advantages of a smaller sidewall height include less incidents of pinch flat compared to conventional rims, either with or without tubes, the ability to run lower air pressure in the tire based upon a larger available air volume, and approximately 4 mm more tire surface exposure for improved traction.

3

4

According to the embodiments of the invention, the inner profile of the sidewall has substantially the same profile shape as the bead of the tire. This produces a 'ball-and-socket' type fit that helps to reduce strain on the tire bead while creating a tighter seal. The conventional bead lock at the distal end of the sidewall also has been eliminated. Thus, in an aspect, additional material can be used in the central part of the proximal surface of the rim for added strength and stiffness without increasing the overall weight of the rim.

The hump in the center of the distal surface of the rim is generally convex-shaped, forming an arch-type structure that adds additional strength to the rim. Alternatively, the hump may have a generally flat-top or other shape. The hump does not extend above the shelf of the distal surface as this would make tire mounting difficult. The troughs extending axially away from both sides of the hump provide separate channels for each tire bead. This feature greatly eases the effort of inflation as the separate channels make it easier to trap air. The hump also acts to keep the tire spread apart and allow for the valve stem to inject air directly into the center of the tire.

Another embodiment of the invention is directed to a bicycle wheel, including a rim as outlined above, a plurality of spokes engaged at respective ends thereof with the rim, and a hub engaged with the plurality of spoke members at opposite ends thereof.

Another embodiment of the invention is directed to a bicycle wheel assembly comprising a bicycle wheel as outlined herein above, and a tube and/or tire mounted on the rim.

The foregoing and other objects, features, and advantages of embodiments of the present invention will be apparent from the following detailed description of the preferred embodiments, which makes reference to several drawing figures.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a cross sectional view of an exemplary bicycle wheel rim with an inflatable tire mounted thereon as known in the prior art;

FIG. **2** is a cross sectional view of a bicycle wheel rim according to an embodiment of the invention;

FIG. **3** is a figure identical to FIG. **2** with the addition of a mounted, inflated tire according to an embodiment of the invention;

FIG. **4** is a view identical to that of FIG. **2** showing dimensional indicia according to an exemplary aspect of the invention;

FIG. **5** is a cross sectional view of a bicycle wheel rim according to an exemplary aspect of the invention;

FIG. **6** is a cross sectional view of a bicycle wheel rim according to an exemplary aspect of the invention;

FIG. **7** is a cross sectional view of a bicycle wheel rim according to an exemplary aspect of the invention; and

FIG. **8** is a cross sectional view of a bicycle wheel assembly according to an embodiment of the invention.

DETAILED DESCRIPTION OF A PREFERRED EMBODIMENT OF THE INVENTION

Reference is now made to FIG. **2**, which shows a bicycle wheel rim **500** in cross sectional view according to an embodiment of the invention. According to embodiments of the invention, the rim **500** is adaptable for mounting a tubeless tire shown at **600** in FIG. **3** or a tire including an inner tube **610** as illustrated in FIG. **8**. As shown in FIG. **1**, the rim **500** has a circular base portion **505** having a proximal surface **508** that is engageable with a plurality of spokes **710** (see FIG. **8**). The base portion also has a distal surface **511** in opposition to proximal surface **508** that, in part, supports the tube and/or tire. As shown in cross section, the distal surface **511** has a central hump **514**, a trough **517** that is contiguous with the central hump, and a flat shelf **520** immediately adjacent and contiguous with the trough. The rim further has an integral sidewall **530** that extends generally radially upward from an intersecting region **533** of the proximal surface and the distal surface. In all embodiments set forth herein, the sidewall has a height, H, defined as the distance between the surface of the shelf **520** and a distal point **536** of the sidewall **530** that is less than or equal to 0.200 inches. FIG. **4** illustrates the sidewall height, H. The maximum sidewall height, H, is on the order of 2 mm less than the corresponding height of conventional rim sidewalls, which typically ranges between about 0.225 in to 0.265 in and above. The reduced sidewall height as embodied herein provides numerous advantages. For example, less of the tire sidewall is available to exert pressure against the rim sidewall; thus, there is less mechanical leverage exerted by the tire against the rim sidewall. This further results in less flexing of the sidewall particularly in the region designated at **533** in FIG. **2** where cracking and material fatigue may occur. Furthermore, approximately 4 mm more tire surface is available resulting in a larger air volume, the ability to run lower tire pressures, increased traction and reduced incidents of pinch flat or snake-bite puncture. In a particular aspect, the sidewall height, H, is between 0.150 in to 0.195 in. In an exemplary aspect, the sidewall height is between about 0.171 in to 0.175 in.

It will be noted that the distal end **536** of the sidewall **530** does not include a bead lock portion. This is due, in part, to a desirable aspect of the sidewall design; that is, the interior surface profile **542** of the sidewall has a region designated at **541** where the sidewall surface blends to the surface of the flat shelf, that substantially corresponds to a profile shape **650** of the tire bead **620** as illustrated in FIG. **3**. This correspondingly similar shape of the sidewall interior surface **541** provides a "ball-and-socket " fit between the sidewall and the tire bead when the tire is fully inflated. The need for a bead lock is thus eliminated and shown in the figures, the sidewall **530** does not have a bulbous shape at the distal end **536**, as in the prior art of FIG. **1**, so that a thickness of the sidewall **530** is not increased from where the sidewall **530** begins to extend inwardly to the distal end **536**. Since weight reduction is always a goal of improved rim design, elimination of the bead lock eliminates the weight associated with them. In an aspect, illustrated in FIG. **6**, the weight savings from the bead lock elimination can be redistributed to other regions of the rim for increased strength; for example, the central region **509** of the proximal surface of the rim can be thickened as shown at **510** without increasing the overall weight of the rim. In an exemplary embodiment, the bead seat **520** is disposed horizontally with respect to an axial direction of a rim. FIG. **8** shows such a configuration.

In still another aspect relating to sidewall design, the outer surface of the sidewall can be squared off, for example, as shown at **539** in FIG. **7**.

Referring again to FIG. **2**, in the illustrated aspect, the distal surface **511** is smooth and continuous; i.e., it contains no acute inflection points between the shelves **520**, the troughs **517** or the hump **514**. As further illustrated, the hump has a substantially convex profile. This shape forms an

US 7,334,846 B2

5

arch structure along the center of the rim surface that contributes to the strength and stiffness of the rim. In an alternative aspect as illustrated in FIG. **5**, the hump may be flat topped as shown at **516** or be otherwise shaped as those skilled in the art will appreciate. As shown in FIG. **4**, a distal point **515** of the hump **514** extends a distance, Y, above the base of the trough **517**. According to an aspect of the embodiment, the value, Y, is between about 0.054 in to 0.062 in. In an exemplary aspect, Y has a value of approximately 0.058 in.

It can be further observed in FIG. **2** that the troughs **517** on opposite axial sides of the hump **514** effectively form two channels. When a tire is initially mounted on the rim, each of the tire beads will sit in a respective trough region **517**. Not only do the hump and troughs serve to keep the tire beads separated and confined prior to and during inflation, the separate channels created by the troughs make it easier to trap air and thus easier to inflate the tire particularly in the case of manual pumping. The hump and troughs also keep the tire spread apart and allow for the valve stem (not shown) to inject the air directly into the center of the tire, easing the inflation process. In an aspect as illustrated in FIG. **4**, the overall trough distance, X, (alternatively, the separation distance between the shelf portions **520**) is between about 0.300 in to 0.700 in. This range of separation distance, X, will accommodate various tire profiles. In a more particular aspect, X is between about 0.535 in to 0.549 in. In an exemplary aspect, X is approximately equal to 0.542 in.

According to another embodiment, illustrated with respect to FIG. **8**, a bicycle wheel **900** includes a rim **500** as described above in all its various aspects, a plurality of spokes **710** engaged at respective ends **711** thereof with the rim and a hub **800** engaged with the plurality of spokes at opposite ends **712** thereof.

In another embodiment, a bicycle wheel assembly includes the wheel **900** as schematically illustrated in FIG. **8** and further includes a tire **600** mounted on the wheel rim. In an aspect, a tube **610** may be used.

The foregoing description of the preferred embodiment of the invention has been presented for the purpose of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible in light of the above teaching. It is intended that the scope of the invention be limited not by this detailed description, but rather by the claims appended hereto.

I claim:

**1**. A bicycle wheel rim onto which a tubeless tire can be mounted, comprising:

a base portion having a proximal surface engageable with a spoke member and an opposing distal surface engageable with a surface of a tire bead of the tubeless tire, wherein the distal surface has a trough, and, in cross sectional profile, a flat bead seat immediately adjacent and contiguous with the trough to an intersection point with a respective sidewall surface such that the tire bead rests on the flat bead seat when mounted; and

an integral sidewall extending from an intersection of the proximal surface and the distal surface, wherein a most distal point of the sidewall extends no further than 0.200 inches above the flat bead seat of the distal surface of the rim,

6

wherein the bead seat is horizontally disposed with respect to an axial direction of the rim so that when the tire is mounted, the tire bead is pressed between the flat bead seat and the sidewall to provide a ball and socket fit.

**2**. The rim of claim **1**, wherein the distal point of the sidewall extends from between 0.150 inches to 0.195 inches above the bead seat of the distal surface of the rim.

**3**. The rim of claim **2**, wherein the distal point of the sidewall extends between 0.171 inches to 0.175 inches above the bead seat of the distal surface of the rim.

**4**. The rim of claim **1**, wherein the distal surface of the rim has a central hump such that the trough is contiguous with the central hump.

**5**. The rim of claim **4**, wherein the hump does not extend above the flat bead seat of the distal surface of the rim.

**6**. The rim of claim **1**, wherein the sidewall has an inwardly curved inner surface and does not include a bulbous bead lock portion, such that a thickness of the sidewall is not increased from where the sidewall begins to extend inwardly to the distal point of the sidewall in a direction extending from the bead seat towards the distal point.

**7**. The rim of claim **1**, wherein at least a portion of an interior surface of the sidewall has a profile that substantially matches a profile of an engaging surface of the tire bead.

**8**. The rim of claim **1**, wherein the distal surface of the rim is smooth and continuous and contains no inflection points between any of the hump, the trough and the bead seat.

**9**. The rim of claim **1**, wherein the hump has a substantially convex cross sectional profile.

**10**. The rim of claim **1**, wherein the hump has a substantially arched cross sectional profile.

**11**. The rim of claim **1**, wherein the hump has a substantially flat-topped cross sectional profile.

**12**. The rim of claim **1**, wherein a central region of the proximal surface has a material thickness greater than the material thickness of a peripheral region of the proximal surface.

**13**. The rim of claim **1**, wherein the distal surface comprises a single hump, two troughs, two shelves, and two sidewalls.

**14**. The rim of claim **13**, wherein the hump and the two troughs are located intermediate the two shelves, further wherein the two shelves are separated by a distance, x, where 0.300 in <x<0.700 in.

**15**. The rim of claim **14**, wherein 0.535 in <x<0.549 in.

**16**. The rim of claim **15**, wherein x=0.542 in.

**17**. The rim of claim **1**, comprising a trough to hump distance, y, where 0.054 in <y <0.062in.

**18**. The rim of claim **17**, wherein y ≈0.058 in.

**19**. The rim of claim **1**, wherein the sidewall has an inner surface facing inwardly and an outer surface facing in an outward direction of the rim and the outer surface has a contour that follows the contour of the inner surface.

**20**. A bicycle wheel, comprising:

the rim of claim **1**;

a plurality of spoke members engaged at respective ends thereof with the rim; and

a hub engaged with the plurality of spoke members at opposite ends thereof.

**21**. A bicycle wheel assembly, comprising:

the bicycle wheel of claim **20**; and

a tire mounted around the rim.

**22**. The bicycle wheel assembly of claim **21**, further comprising an inner tube mounted on the rim between the rim and the tire.

US 7,334,846 B2

<table>
<tr><td>7</td><td>8</td></tr>
</table>

**23**. A bicycle wheel rim onto which a tubeless tire can be mounted, comprising:

a base portion having a proximal surface engageable with a spoke member and an opposing distal surface engageable with a tire bead of the tubeless tire, wherein the distal surface has a trough, and, in cross sectional profile, a flat bead seat; and

an integral sidewall extending from an intersection of the proximal surface and the distal surface, wherein a distal most point of the sidewall extends between 0.150 inches to 0.175 above the flat bead seat of the distal surface of the rim.

**24**. The rim of claim **23**, wherein the sidewall has an inner surface facing inwardly and an outer surface facing in an outward direction of the rim and the outer surface has a contour that follows the contour of the inner surface.

**25**. The rim of claim **23**, wherein the bead seat is horizontally disposed with respect to an axial direction of the rim.

**26**. The rim of claim **23**, wherein the bead seat is horizontally disposed with respect to an axial direction of the rim so that when the tire is mounted, the tire bead is pressed between the bead seat and the sidewall to provide a ball and socket fit.

**27**. The rim of claim **26**, wherein the distal surface of the rim has a central hump such that the trough is contiguous with the central hump.

**28**. The rim of claim **26**, wherein the sidewall has an inner surface profile that matches a contour of an engaging surface of the tubeless tire along the entire sidewall, further wherein the profile has an inner surface that extends inwardly and is curved from an intersection point of the bead seat with the sidewall, such that a bulbous bead lock portion is absent from a distal region of the sidewall so that a thickness of the sidewall is not increased from where the sidewall begin to extend inwardly to a point most distal the bead seat.

**29**. The rim of claim **23**, wherein the distal most point of the sidewall extends between 0.171 inches to 0.175 inches above the bead seat of the distal surface of the rim.

\* \* \* \* \*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 6th day of July, 2015 I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all counsel of record.

I further certify that pursuant to Fed. R. App. P. 25(a)(2)(D) and 25(c), Federal Circuit Rule 25(a), and ECF-10(B) of the Court's Administrative Order Regarding Electronic Case Filing, dated May 17, 2012, I shall cause six paper copies of the foregoing brief to be filed at the address provided below within five days of the Court's acceptance of the foregoing brief in the CM/ECF System:

> Office of the Clerk
> United States Court of Appeals for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C. 20439

> */s/ Jonathan H. Margolies*
> Jonathan H. Margolies
> Attorney for Appellant
> Specialized Bicycle Components, Inc.

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32

1.    This BRIEF OF APPELLANT complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7) because it contains 6,341 words.

2.    This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(6) and the type style requirements of Federal Rules of Appellate Procedure 32(a)(5) because of it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

Dated July 6, 2015.


*/s/ Jonathan H. Margolies*
Jonathan H. Margolies
Attorney for Appellant
Specialized Bicycle Components, Inc.